Ault Unemployment Compensation Case.

Argued April 15, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John P. Campana*, for claimant, appellant.

*Sydney Reuben*, Assistant Attorney General, and *Thomas D. McBride*, Attorney General, with them *Harry J. Rubin*, Deputy Attorney General, for appellee.

*William H. Wood*, with him *Leon D. Metzger*, and *Hull, Leiby and Metzger*, for employer, intervening appellee.

*Sidney G. Handler* and *Goldberg, Feller & Bredhoff,* filed a brief for United Steelworkers of America, AFL-CIO, under Rule 46.

OPINION BY WOODSIDE, J., December 11, 1958:

On the basis of the information before it, the Bureau of Employment Security denied Paul E. Ault's claim for unemployment compensation. Subsequently, an Unemployment Compensation Referee and the Unemployment Compensation Board also concluded that the claim should be denied. Ault then appealed to this Court.[1]

---

[1] The Attorney General appeared personally before us and argued this and companion cases in favor of the claimants and *against* the Unemployment Compensation Board. We are of the opinion that he should not have argued *against* an agency of the Commonwealth which the legislature directed him to represent in litigation. See section 903(b) of The Administrative Code of April 9, 1929, P. L. 177, 71 PS §293.

The attorney general is charged by The Administrative Code with the duty of not only representing the boards and commissions in court but also of giving them legal advice. See Section 902, 71 PS §292 and section 512, 71 PS §192. However, within their respective fields these boards and commissions are given authority to make decisions which involve not only findings of fact, but also conclusions of law. They must determine the law applicable to the facts of the cases before them. As we view it, the legislature did not intend that the attorney general should examine each case before these quasi-judicial bodies to determine how he thinks the board or commission should decide them. The legislature provided for the review of these decisions by courts to which appeals are allowed. Appeals from these decisions are not to the attorney general.

This brings us to the question of what the attorney general should do when he personally believes the decision of such board or commission is erroneous. The legislature directs the attorney general to represent the board or commission before the court. He cannot carry out this duty if he substitutes his own personal views of the law for the board's decision. On the other hand, we

Every covered employe in this Commonwealth has an interest in the unemployment compensation fund,

recognize that a lawyer may have such strong convictions concerning a legal principle that he feels he can, in good conscience. argue only one position to the court.

The Attorney General in this case believed the decision of the Unemployment Compensation Board to be erroneous, but there are convincing arguments which he could have, and should have presented to us to support the position of the board. The millions of employes who have an interest in the fund and the board which has a duty to protect it from unwarranted claims are entitled to have their side of the controversy presented to the Court. Furthermore, this Court is entitled to have the board's position fairly and adequately presented. Employers are frequently not concerned with protecting the fund against improper claims by their employes, and it is the attorney general to whom this Court must look for the Commonwealth's side of such cases.

We do not question the attorney general's motives. He undoubtedly did what he conceived to be his duty as an officer of the Commonwealth and of this Court. Furthermore, we recognize that the duties of an attorney general cannot always be measured by the same yard-stick used to measure the duties of private counsel. There are occasions where an attorney general is required to represent both sides of a case, as, for example, when the Highway Department appeals from a Public Utility Commission order. In such cases he cannot believe both sides to be right, and yet he is charged by statute with presenting both sides to the court. This, of course, is done through deputies or counsel assigned to the agencies involved, but inasmuch as all of these represent the attorney general himself, the attorney general is on both sides of the case.

It has been suggested that an attorney general should never be on both sides of a case. Legal disputes between departments or even between a department and a board or commission *involving administrative problems* should be, and are, settled by the opinions of the attorney general, which as to such agencies have the effect of law. An attorney general has no problem in determining his duty as to these matters. His soul-searching is induced by the problems that arise out of the decisions of the quasi-judicial boards and commissions. Here he may frequently disagree with the decisions of these boards and commissions, and yet under the

which is to protect him in case of unemployment through no fault of his own. The unemployment compensation authorities have a duty to every covered employed person to protect the fund against claims of those not entitled to payment out of it. They, likewise, have a duty to every unemployed person covered by the law to see that such person receives from the fund that to which he is entitled.

An unemployment case is not a law suit between the employer and the employe, although it has sometimes mistakenly been considered as such.[2] An unemployment compensation case is a claim by the unemployed person against the unemployment compensation fund.

It is the duty of the referee and the board to determine *all* the facts—those which favor the claimant, and those which would protect the fund from any improper or illegal payment to the claimant. *Gagliardi Unemployment Compensation Case*, 186 Pa. Superior Ct. 142, 141 A. 2d 410 (1958).

law which he must administer with fidelity, he is charged with the duty of representing them in court. These boards and commissions are not in the category of ordinary lay clients, but are quasi-judicial bodies, more nearly in the category of courts, and therefore not as directly subject to the legal advice of their lawyer as are lay clients.

It is not the purpose of this footnote to chastise the Attorney General for his conduct, but we feel that we could not ignore his appearing before us to argue in *favor* of the claimant and *against* the Commonwealth lest it appear from the record of this case that we condoned this procedure. We have, therefore, set forth what this Court believes to be the duty of the attorney general in matters such as the one before us.

[2] This mistaken idea arises because the employer's unemployment compensation tax is frequently (although not always) affected by the outcome of an employe's claim, and for this reason the employer sometimes opposes the claim.

The claimant in this case refused to give the unemployment compensation authorities information which in the opinion of the authorities, had a bearing upon the claimant's right to compensation. The facts leading up to his refusal to give information were as follows: Ault had been employed by the Bethlehem Steel Company for a number of years. On December 14, 1954, the company notified him that he was suspended, and that it was its intention to discharge him. The reasons given him by his employer were that he was "a security risk" and had "engaged in conduct detrimental to the business interests of the company." Upon the request of Ault, the company held a hearing on the question of whether he should be discharged. At the company hearing, Ault was advised that he had been identified under oath before a Congressional Committee as being a member of the Communist Party; that he was given an opportunity to deny his Communist affiliation by the Congressional Committee, and had failed to do so; that the Communist Party has as one of its aims the overthrow of the United States Government by force and violence; that the company by which he was employed was important to national defense; and that one affiliated with the Communist Party was believed by the company to be a security risk to the company, its property, its employes and its production.

Ault was advised at the company hearing that his employer would receive whatever evidence he wished to present "whether sworn or otherwise" as to why the company should not discharge him. Ault said of the accusation, "I'm not saying I did or I didn't . . . If you think you're going to get me to help you fire me, you're badly mistaken." He did, however, present a statement in which he made no denial that he was a member of the Communist Party. The statement was

primarily a tirade against the Congressional Committee and its chairman, but in it was the following: "With clear conscience, I can say, I am a good American. I love my country. I have never done anything against the best interests of the American people and I never will." However, he refused to discuss with his employer whether the specific charges made against him before the Congressional Committee were true or false.

The company discharged Ault, and he thereupon applied for unemployment compensation. At the hearing *before the unemployment compensation referee* he presented testimony to support his claim for unemployment compensation, but refused to answer whether he was presently a member of the Communist Party; whether he had ever given to any members of the Communist Party information concerning internal conditions at the Bethlehem Steel Company plant; whether he had been a member of the District Steel Commission of the Communist Party; whether he had attended conventions of the Communist Party, and similar questions.

The Unemployment Compensation Board of Review found, inter alia, that during the course of hearings before the Congressional Committee dealing primarily with subversion and espionage in defense establishments and industry, the claimant was identified as a member of the Communist Party by a witness who joined the Communist Party at the request of the Federal Bureau of Investigation; that the claimant refused to deny the charges against him; and that the employer had defense contracts which were jeopardized by the claimant's conduct. The board concluded that under the Unemployment Compensation Law, the claimant's actions constituted willful misconduct connected with his employment and denied him compensation.

Section 402(e) added to the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, by the Act of May 29, 1945, P. L. 1145, §9, 43 PS §802 (e), as subsequently amended reads: "An employe shall be ineligible for compensation for any week . . . (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work . . ."

"Willful misconduct" comprehends an act of wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules or a disregard of standards of behavior which the employer has a right to expect of an employe. *Moyer Unemployment Compensation Case,* 177 Pa. Superior Ct. 72, 74, 110 A. 2d 753 (1955). "Willful misconduct" does not necessarily require actual intent to wrong the employer. If there is a conscious indifference to the perpetration of a wrong, or a reckless disregard of the employe's duty to his employer, he can be discharged for "willful misconduct", and will be denied benefits. *Ristis Unemployment Compensation Case,* 178 Pa. Superior Ct. 400, 116 A. 2d 271 (1955). "An employe is obliged to render loyal . . . service to his employer." *Sopko Unemployment Compensation Case,* 168 Pa. Superior Ct. 625, 628, 82 A. 2d 598 (1951).

The claimant states as the question before us: "Does the invocation of the Fifth Amendment of the Constitution of the United States, against self-incrimination, thereby constitute such willful misconduct on the part of the Appellant in connection with his work as to justify his disqualification for unemployment compensation benefits under Section 402(e) of the Unemployment Compensation Law?"

There is, however, much more to this case than the refusal of the claimant to furnish to his government information which its legally constituted officials

thought would be helpful to it in its struggle against the international conspiracy to destroy our religion, our economy and our political freedom by violent overthrow of our government. (He had a constitutional right to refuse to give this information to his government, but the exercise of such right is certainly not praiseworthy).

The claimant was identified under oath before a governmental agency holding public hearings as being a member of the Communist Party. This raises immediately the question: What does membership in the Communist Party connote? If such membership is to be considered as no more than an expression of a belief in a political, economic or religious philosophy, or a way of life different from that enjoyed (they would say "suffered") in this country today, then that *alone* would suggest nothing unlawful. Man should, and under our Constitution must, be free to think as he pleases concerning such matters. Undoubtedly there were among those who joined the Communist Party a decade or so ago—before the diabolical purposes of the organized Communist movement became clear to all—some whose only aim was to bring about change in our political and economic laws by constitutional and legal process. But, if there was then doubt as to the true purpose of the Communist movement, such doubt can no longer exist among informed people.[3]

---

[3] In a report to Attorney General William P. Rogers, Honorable J. Edgar Hoover, Director of the F.B.I. warned that apathy toward the threat of subversion continued to grow in 1958, and further stated:

"Sensing a more favorable atmosphere, the Communist Party, USA, and its dupes and sympathizers gained further courage and became more vocal in their attacks upon law enforcement and other professions which are dedicated to preserving our freedoms,

· · ·

The General Assembly of this Commonwealth has declared that the Communist Party of the United States and its local component in Pennsylvania is a part of an international revolutionary Communist conspiracy. See Act of December 21, 1951, P. L. 1712, 18 PS §3811. Membership in the Communist Party, therefore, under the law of this Commonwealth, connotes membership in an international conspiracy to overthrow by force and violence the governments of the United States and this Commonwealth. That was the accusation made publicly against the claimant before a governmental agency by a citizen under oath. Let us ignore for the moment the refusal of the claimant to deny this charge when he was called before the Congressional Committee.

The company had contracts with the United States Government to furnish the armed forces materials to protect our country against the Communist conspiracy. One of the company's employes is charged with membership in this organized conspiracy to overthrow by force and violence the government of the United States.

Every patriotic citizen would expect an employer engaged in defense work to ask an employe whether such charges are true, and would expect an employe to discuss such charges frankly and honestly with his employer. If there were sworn accusations against a bank employe that he was short in his account as treasurer of his club, certainly the directors of the bank

---

"The Communist Party professes to be a legtimate political organization on the American scene; however, its leadership reins are firmly held by rabidly pro-Soviet elements, and the Party's ultimate objective remains the overthrow and destruction of our Government by force and violence.

"Throughout 1958 the Party continued to function as an integral part of the international communist conspiracy which now controls more than one third of the earth's people."

would be expected to ask the employe for an explanation, and upon his refusal to make any, they would be expected to discharge him. Such conduct on the part of the employe would indicate a conscious indifference to the perpetration of a wrong against his employer.

The claimant in this case refused to frankly and fully discuss with his employer the sworn charges of misconduct which had been made publicly against him. This refusal was a willful disregard of the employer's interests, and a disregard of standards of behavior which the employer had a right to expect of him. The employer was, therefore, justified in discharging him for willful misconduct.

It has long been recognized as the duty of a government employe to explain to his employer charges made against him. His failure to do so has been recognized by many courts in many cases as a disregard of standards of behavior which the employer has a right to expect of an employe. *Souder v. Phila.*, 305 Pa. 1, 156 A. 245 (1931) ; *Kaplan v. Phila. School District*, 388 Pa. 213, 130 A. 2d 672 (1957) ; *Board of Public Education School District of Phila. v. Beilan*, 386 Pa. 82, 125 A. 2d 327 (1956), affirmed by the U. S. Supreme Court, 357 U. S. 399, 78 S. Ct. 1317; *Christal v. Police Commission*, 33 Cal. App. 2d 564, 568, 92 P. 2d 416, 419 (1939) ; *Faxon v. School Committee of Boston*, 331 Mass. 531, 534, 120 N.E. 2d 772, 774 (1954) ; *Daniman v. Bd. of Education of City of N. Y.*, 306 N. Y. 532, 119 N.E. 2d 373 (1954).

In *Garner v. Bd. of Public Works of Los Angeles*, 341 U. S. 716, 720, 71 S. Ct. 909 (1951), Mr. Justice CLARK said: "Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry . . ."

In the recent case of *Lerner v. Casey*, 357 U. S. 468, 78 S. Ct. 1311 (1958), the Supreme Court pointed out that "a finding of doubtful trust and reliability could justifiably be based on (an employe's) lack of frankness," quite independently of the employe's reasons for his silence. Justice HARLAN, speaking for the Court there said: "This Court pointed out in Garner that a government employee can be required upon pain of dismissal to respond to inquiry probing into matters relevant to his employment, and that *present membership in the Communist Party is such a matter*." See also *Beilan v. Board of Public Education*, supra, 357 U. S. 399.

In addition to Ault there were three other employes of the Bethlehem Steel Company who appeared before the Congressional Committee and refused to answer questions on the grounds that their answers would incriminate them. One of the four was reinstated by the employer when he cleared himself of the charges involved and explained his resort to the Fifth Amendment. This, it seems to us, indicates that Ault had the same opportunity and had he done that which any employer under the circumstances would expect of his employe, he too, presumably would not have been discharged.

Was the claimant's misconduct "connected with his work"? Even though it was "willful misconduct," if it was not "connected with his work", the conduct would not make him ineligible for compensation. We think it was connected with his work. It is important to the security of all of us that manufacturing plants producing materials which are used for our defense should not have in their employ people whose loyalty is so seriously thrown into question as a result of their own actions and conduct. When employes of such plants are charged with membership in the Communist

Party the employer not only has a right, but a duty to inquire into the loyalty of those employes. This certainly includes the right to interrogate an employe. Communist Party activity is a matter connected with the work of an employe in a manufacturing concern with government orders. Furthermore, the claimant's conduct not only threatened the employer with loss of certain government contracts, but so aroused the claimant's fellow employes that they refused to work with him, and the employer suffered a work stoppage. Then, too, the unfavorable publicity produced by the claimant's conduct adversely affected the employer's relations with its customers. These results indicate that the claimant's conduct was not unconnected with his work.

Entirely aside from the refusal of the claimant to answer questions before the Congressional Committee, and before his employer, the claimant must be denied unemployment compensation for another reason. That is his refusal to answer questions put to him by the unemployment compensation authorities. As stated above it is the duty of the unemployment compensation authorities to obtain *all* facts necessary to the determination of the claimant's eligibility for compensation.

A claimant seeking unemployment compensation cannot recover by testifying at an unemployment compensation hearing to those facts which entitle him to compensation, and then refusing to testify to those matters which might make him ineligible for such compensation, any more than a plaintiff in an automobile accident case could recover by testifying to facts indicating the defendant's negligence and then refusing to be cross-examined as to facts which might indicate his own contributory negligence.

Prior to the referee's hearing the company obtained and served upon the claimant a subpoena directing him, in accordance with the provisions of sections 506, 507 and 508 of the Unemployment Compensation Law (43 PS §§826, 827, 828), to appear before the referee and give evidence of any information he possessed bearing upon his claim. This subpoena was not necessary, as it was the duty of the claimant to give such information, if he wished to recover. It probably was issued to bring the claimant within the terms of section 508, supra, which requires one subpoenaed to testify even though his answers may tend to incriminate him, and grants an immunity from prosecution for such matter involved in such testimony.

During the hearing the claimant was asked, "Are you a member of the Communist Party?" This he refused to answer on the ground of self-incrimination. Counsel for the employer requested the referee to direct him to answer on the ground that section 508 of the Unemployment Compensation Law required him to do so. The referee refused to require the claimant to answer. We can conceive of no good reason why the claimant should have been required to answer. *But,* if the question was relevant to the inquiry of whether or not the claimant was entitled to compensation and he refused to answer the question after the referee's ruling that the question was relevant, then he is not entitled to recover, and the referee would have been justified in dismissing the claim forthwith for that reason. By refusing to answer the claimant abandoned his claim.

When an employe was discharged by his employer as a security risk after such employe had been publicly charged before a governmental agency by sworn testimony with being a member of the Communist Party, we think the above question was relevant to the em-

ploye's right to unemployment compensation and that he should have answered it. It certainly had a direct bearing on whether his employer was justified in refusing to continue the employment of the claimant. If he was a security risk, the employer should have discharged him. If he was a security risk as the result of his own willful conduct, he is guilty of willful misconduct.

There is one other question raised by the claimant. He argues that there is no legally competent evidence concerning what happened before the Congressional Committee. However, throughout his own testimony he refers to the Congressional hearing, and his refusal to testify and to affirm or deny the charges there made against him. At no time did he question, either to his employer or the compensation authorities, the frequently repeated statement that he was charged before the Congressional Committee with being a member of the Communist Party.

We think the claimant should be denied compensation, first because as claimant he refused to furnish information to the compensation authorities bearing upon his right to compensation, and, secondly, because in refusing to answer the above charges when called upon to do so by his employer he was guilty of willful misconduct connected with his work.

Decision affirmed.

WRIGHT, J., concurred in the result.