Aaron OSTROFSKY

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, A.F.L.–C.I.O., United Steelworkers of America, Local Union No. 2609, an unincorporated association, and Bethlehem Steel Company, a body corporate.

Joseph HENDERSON

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, A.F.L.–C.I.O., United Steelworkers of America, Local Union No. 2610, an unincorporated association, and Bethlehem Steel Company, a body corporate.

William H. WOOD

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, A.F.L.–C.I.O., United Steelworkers of America, Local Union No. 2610, an unincorporated association, and Bethlehem Steel Company, a body corporate.

Benjamin M. FINO

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, A.F.L.–C.I.O., United Steelworkers of America, Local Union No. 2610, an unincorporated association, and Bethlehem Steel Company, a body corporate.

Civ. Nos. 10909–10912.

United States District Court
D. Maryland.
March 20, 1959.

Fred E. Weisgal, Baltimore, Md., for plaintiffs.

David E. Feller and Arthur J. Goldberg, Washington, D. C., and Jacob J.

Edelman and Marshall A. Levin, Baltimore, Md., for United Steelworkers of America and Locals No. 2609 and 2610.

John H. Morse and Cravath, Swaine & Morse, New York City, and H. Vernon Eney, William J. McCarthy and Venable, Baetjer & Howard, Baltimore, Md., for Bethlehem Steel Co.

THOMSEN, Chief Judge.

These four consolidated actions are before the court on motions for summary judgment filed by each of the parties. Each action was originally brought in the Superior Court of Baltimore City by a former employee of Bethlehem Steel Company (Bethlehem) against that Company, The United Steelworkers of America AFL-CIO (the Union), and the local of which he was a member. The actions were removed to this court, by the Union and the locals on the ground that a federal question is involved, and by Bethlehem on grounds both of federal question and diversity.

Each plaintiff was discharged by Bethlehem on May 24, 1957, for the stated reasons that he was a security risk and that he had engaged in conduct detrimental to the business interests of Bethlehem. In each action the plaintiff seeks (1) to compel arbitration of his claim that he was wrongfully discharged under the terms of a collective bargaining agreement between Bethlehem and the Union, and (2) to recover $100,000 damages from the defendants, jointly and severally, on account of such discharge and the Union's refusal to press his grievance.

The principal issues raised are whether and under what circumstances plaintiffs have the right to maintain such actions, whether the Union or the Company violated any contractual or statutory duty to plaintiffs in refusing to submit plaintiffs' grievances to arbitration, and whether the discharges were for "just cause".

The essential facts are not disputed.

## The Parties

Bethlehem, a Pennsylvania corporation, owns and operates a number of steel plants and shipyards, including a plant at Sparrows Point, Maryland, which is the largest steel plant in the United States and employs about 29,000 people.

The Union is an unincorporated association, which acts as the collective bargaining representative for employees throughout the steel industry. Each applicant for membership in the Union signs a form which authorizes the Union, its agents or representatives, "to act for me as a collective bargaining agency in all matters pertaining to rates of pay, hours of employment, or other conditions of employment, and to enter into contracts with my employer covering all such matters." The Union's Constitution authorizes it to act as the exclusive agent for its members for the "presentation, maintenance, adjustment and settlement of all grievances and other matters relating to the terms and conditions of employment or arising out of the employer-employee relationship."

Plaintiffs had been employed at Bethlehem's Sparrows Point plant for more than eight years before May 1957, and were members of the Union, Ostrofsky of Local 2609 and the others of Local 2610.

## The Agreement

On August 3, 1956, the Union entered into a comprehensive agreement with Bethlehem which sets forth the terms and conditions of employment of the steelworkers at Sparrows Point and other Bethlehem plants. It contains a so-called "Management Functions" clause (Article XIII), which states:

"The management of the Plants and the direction of the working forces and the operations of the Plants, including * * * the suspending, discharging or otherwise disciplining of employees for just cause * * * are the exclusive functions of the Management; provided, that in the exercise of such functions the Management shall

observe the provisions of this Agreement * * *."

Article XII provides that Bethlehem, before discharging an employee, shall give him written notice of its intention to discharge him. The employee then has five days in which to request a hearing, whereupon Bethlehem must supply the employee with a written statement of its reasons for the discharge, and schedule a hearing before an official of the Company. At such hearing the employee may appear for himself or may be represented by the Grievance Committee of the Local Union. Within ten days after the hearing the Company must inform the employee of the action it has decided to take. If the employee is discharged, he may file a written grievance with the Management Representative, to be processed according to the grievance procedure provided in Article XI of the Agreement, beginning with "Step 3". The Step 3 meeting is "between the Management's Representative and the Grievance Committee and a representative of the Union". At that meeting, witnesses may be called by "either the Management or the Union." Minutes of the meeting "shall be signed by the Chairman or Secretary of the Grievance Committee and the Management's Representative", and shall include a brief statement of the Union's position with regard to each grievance, a brief statement of the Company's position, the action taken, and a "statement as to whether or not the Union concurred in such action and of any exceptions taken by the Union thereto."

There is no provision for any further appeal by the employee. Either the Union or the Company may carry a grievance to Step 4 by giving notice to the other party in writing within thirty days after the date of the Step 3 meeting, or within twenty days after a draft of the minutes of such meeting shall have been received by a representative of the Union, whichever period is longer. Step 4 meetings are held at the Company's headquarters in Bethlehem, Pennsylvania, between two representatives of the Union and two representatives of the Company.

If a satisfactory settlement is not reached at the Step 4 meeting or meetings, and if the grievance involves "the meaning and application of the provisions of this Agreement", the Union may appeal to an "impartial umpire to be appointed by mutual agreement of the parties hereto", i. e., the Company and the Union. If no such appeal is taken, "such grievance shall be deemed to have been settled in accordance with such action and no appeal therefrom shall thereafter be taken". The decision of the umpire on any matter which shall properly have been referred to him shall be final and binding "upon the Company and all Employees concerned therein".

### Bethlehem's Policy

In 1954 Bethlehem was advised that a subcommittee of the Senate Committee on Government Operations had recommended to the Secretary of Defense that he withdraw or cancel any defense contracts with corporations "that insist on employing Communists or subversives, or those who refuse to deny or affirm their connection with subversive organizations". Shortly thereafter Bethlehem adopted a policy not to employ members of the Communist Party and discharged three men, Ault, Piccuci and Szabo, who had been identified as members of the Communist Party by one Thomas, a witness before that Congressional Committee. Relying upon the Fifth Amendment, these men had refused to admit or deny the accusation before the Committee, and they refused to answer similar questions put to them by the Company. Bethlehem discharged them as security risks and for conduct detrimental to the business interests of the Company. The Union carried the grievances of these three men to arbitration before Judge Charles Desmond[1], who found that "the absence of

---

1. In Re Bethlehem Steel Co. and United Steelworkers of America (CIO), 24 Lab. Arb.Reps. 852. See also Ault v. Unemployment Comp. Bd. of Rev., 188 Pa. Super. 260, 146 A.2d 729.

any denial does not make Thomas' statement true, but it leaves those statements without disproof and creates at the very least a basis by the Company for believing Thomas. Whether I myself would so believe it is beside the point. It was not irrational or baseless or fundamentally unjust for the Company to believe him and to act on that belief." Judge Desmond concluded that there was "just cause for the discharge by the Company of each of the grievants".

### The Discharges in the Instant Cases

In May 1957 the House Committee on Un-American Activities conducted an investigation of Communist activity in the Baltimore area. At a public hearing before the Committee on May 7, Clifford C. Miller testified that he had been a member of the Communist Party in 1948 and 1949 and had rejoined the Party in 1953 as a secret agent of the FBI. He named the four plaintiffs—Ostrofsky, Henderson, Wood and Fino—and two other Bethlehem employees, Williamson and Spector, as having been members of the Communist Party. Those six men were called before the subcommittee for questioning on the same day. All of them refused to answer any questions relating to any activity for or affiliation with the Communist Party, invoking the privilege against self-incrimination provided by the Fifth Amendment. The hearings and the refusal of the men to testify received wide publicity.

On the following day Bethlehem notified each of the six men in writing that it intended to discharge him on the grounds that he was a "security risk" and that he had engaged in "conduct detrimental to the business interests of the Company", and that it deemed either reason, standing alone, to be "just cause" for discharge within the meaning of the Agreement.

Plaintiffs requested a pre-discharge hearing before an official of the Company, in accordance with Article XII of the Agreement. Such a hearing was held on May 21, 1957. Plaintiffs appeared represented by their present attorney, a member of the Baltimore Bar. The Assistant General Manager of Bethlehem's Sparrows Point Plant explained in detail Bethlehem's reasons for discharging plaintiffs. He stated that each of the plaintiffs had been identified under oath as a Communist; that when each had been given an opportunity to deny his Communist affiliations he had refused to do so; that official agencies and officers of the United States Government had found that the Communist Party has as one of its aims the overthrow of the United States by force and violence; that Bethlehem is important to the national defense and cannot have in its employ persons who subscribe to or actively support the principles of the Communist Party; and that employees with Communist affiliations are deemed to be a security risk to the Company, its property, its employees and its production. He further stated that Bethlehem must, in order to maintain its business interests, have public acceptance and the goodwill of its employees, its customers, and its stockholders, and that there had been instances at the Sparrows Point Plant in which employees had refused, or threatened to refuse, to work with persons who refused or failed to deny that they were Communists.

Each plaintiff read a prepared, sworn statement and answered questions put to him by his counsel to the effect that he had never advocated the overthrow of the government by force or violence and had never belonged to any organization that so advocated. However, each plaintiff declined to state whether or not he was a member of the Communist Party, on the ground that it was irrelevant to his employment. At the conclusion of the hearing Bethlehem stated that the men would be discharged.

On May 22 officials of the Union and the Locals held a meeting which the four plaintiffs, the other two men, and Clifford Miller were asked to attend. After questioning Miller, the Union officials called

in the plaintiffs individually and informed each one that, in view of the evidence at the House Committee hearings and the Union's own interviews with Miller, the Union could not protest his discharge without inquiring as to his affiliation with the Communist Party. Each man was assured that any information he might give would be kept confidential. The plaintiffs, however, refused to give the Union any information.

A conference was held between plaintiffs' counsel and the Assistant General Counsel of the Union, to consider the possibility of plaintiffs discussing the matter privately with the latter so that any information they gave would be protected by the attorney-client privilege. It was understood that the officers of the Local Union would accept any recommendation Union counsel might make on the basis of any confidential information given by the men. After discussing the matter with their counsel, plaintiffs adhered to their original position, although Williamson, one of the other employees who had been discharged, visited the Union's general counsel and made a full statement of his case.

On May 24 the Company notified plaintiffs that they were discharged. On May 31 each plaintiff filed a grievance alleging that his discharge was without "just cause" and requesting reinstatement and back pay for the time lost from work. Accordingly, a Step 3 meeting was held on June 25, in accordance with the provisions of Article XI of the Agreement. Ordinarily Step 3 is a meeting between Union and Company officials, but in this case the individual grievants were permitted to appear with their counsel to present their positions. The Union stated that it took no position with respect to the grievances of these plaintiffs since they had given the Union no facts on the basis of which to formulate a position. The Union did speak at the meeting on behalf of Williamson, who had told the Union's counsel that he had been a member of the Communist Party but had left it, and Bethlehem reinstated him. The Union expressed its willingness to recon-

sider representing any of the other grievants who would discuss, openly, or confidentially, his present connection, if any, with the Communist Party. All of the plaintiffs elected to rely on their testimony at the former hearing and refused to make any explanatory statement. Therefore, Bethlehem reaffirmed its decision.

Counsel for plaintiffs then sought to appeal their grievances to Step 4, but Bethlehem advised him that under the Agreement plaintiffs had no such right of appeal. The Union informed Bethlehem by letter that it did not wish to prosecute the grievances further in view of plaintiffs' continued refusal to discuss the facts with the Union. It added that Bethlehem was free to grant the individuals any further hearing outside the grievance procedure, and that if such a hearing were held the Union wished to attend.

In order to give plaintiffs a further opportunity to explain their position, Bethlehem arranged a meeting between plaintiffs and the Bethlehem representatives who would normally conduct a Step 4 meeting. That meeting was held on August 26, 1957, with plaintiffs' counsel present; but since no new information was made available, Bethlehem did not change its decision.

Plaintiffs then requested the Union to take their grievances to arbitration. The Union refused, for the same reason that it had refused to process the grievances up to that point.

The refusal of the Union to press the grievances was not due to any violation by plaintiffs of Union rules and regulations, but it was not arbitrary, discriminatory or malicious. The decision was taken pursuant to the Union's policy to screen grievances, which the Union officials considered an obligation it owed to the Company, its members, and all other employees, which the Union considered essential to a proper evaluation of their grievances.

Plaintiffs filed unfair-labor-practice charges against Bethlehem and the

Union.[2] The Regional Director of NLRB dismissed those charges on the ground that there was "insufficient evidence of violations to warrant further proceedings", and his decision was sustained by the General Counsel.

Plaintiffs also filed claims for unemployment compensation with the Maryland Employment Security Board. These claims were denied by the Board, and its decision was affirmed by the Superior Court of Baltimore City. On appeal, the Court of Appeals of Maryland said: " * * * it is important to note that the discharge, as distinguished from the suspension, was not based upon an invocation of the privilege against self-incrimination. If we assume, without deciding, that the assertion of that privilege would not amount to misconduct, the record is clear that at the Company hearings the only objections to the questions propounded were based upon their relevance or materiality. In common parlance, they took the position that it is 'none of your business.' We think the objections were not well founded. An employer engaged in an essential industry has a right to inquire into the outside activities of its employee that may adversely affect the prosecution of the work. Steel may be described as the backbone of the industrial economy, and a chief sinew of war. The Company had a number of defense contracts with the government. It was a proper subject of inquiry by the Company to ascertain whether the appellants were active members of a party that has been frequently characterized as engaged in a conspiracy to overthrow the government by force and violence, and particularly by the sabotage of essential industries in the event of war. Code (1951), Art. 95A, sec. 5(b) denies unemployment benefits if the discharge is due to misconduct connected with the work, whether such conduct be 'actual or threatened.' It was not irrelevant for the employer to ask its employees whether they were

members of such a party, regardless of whether doubts as to their trustworthiness and reliability were raised by the Committee hearings, or by rumor and report. The Supreme Court cases of Garner v. Los Angeles Board, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317; Beilan v. Board of Education, 357 U.S. 399, 78 S. Ct. 1317, 2 L.Ed.2d 1414, and Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1324, 2 L. Ed.2d 1433, indicate that such inquiries are relevant, and do not violate the 14th Amendment, at least where an opportunity to refute the charges is offered. See also note, 51 A.L.R.2d 742." Ostrofsky v. Maryland Empl. Sec. Bd., Md., 147 A.2d 741, at pages 743–744.

## What Law Governs

Plaintiffs base their claims against Bethlehem solely on their alleged rights under the Agreement between Bethlehem and the Union, and base their claims against the Union on the duty to represent all employees fairly and without discrimination, imposed on it by sec. 9(a) of N.L.R.A., 29 U.S.C.A. § 159(a), in the light of Steele v. Louisville & N. R. Co., 323 U.S. 192, 198–199, 65 S.Ct. 226, 89 L.Ed. 173, and Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 97 L.Ed. 1048.

(a) There is no authoritative decision on the law to be applied, federal or state, in deciding whether and under what circumstances an employee may enforce arbitration under a collective bargaining agreement.

In Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, a union brought suit under sec. 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, to require arbitration of certain grievances. The Supreme Court held that "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws". 353 U.S. at page 456, 77 S.Ct. at page 918. Even if such a suit is brought in a state court, the court must apply federal

---

2. Plaintiffs alleged violation of secs. 8(a) (1) and 8(a) (5) of the N.L.R.A. by Bethlehem and of 8(b) (2) and 8(b) (3) by the Union.

law, since the outcome of the case should not vary with the forum. McCarroll v. Los Angeles District Council of Carpenters, 49 Cal.2d 45, 315 P.2d 322, certiorari denied 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415.

■ The Agreement involved in this case covers Bethlehem's operations in Pennsylvania and in other states as well as in Maryland; it is highly desirable that the rights created by the Agreement be uniformly interpreted, wherever the grievances arise. Reason, as well as the policy of the national labor laws, forbids the application of one body of law when the plaintiff is a union and of another body of law when the plaintiff is an individual. The rationale of Lincoln Mills indicates that federal law should be applied in determining whether and under what circumstances an employee may enforce arbitration under a collective bargaining agreement. It is not necessary, however, to decide that question in this case, because I conclude that Federal law and Maryland law would be the same.

■ (b) Similar considerations apply in deciding what law governs the question whether and under what circumstances an employee may sue Bethlehem for damages resulting from a discharge alleged to have been in violation of the Agreement. Here again I conclude that Federal law is or should be the same as Maryland law. Jenkins v. William Schluderberg-T. J. Kurdle Co., 217 Md. 556, 144 A.2d 88.

■ (c) The claims of the plaintiffs against the Union are controlled by Federal law. Ford Motor Co. v. Huffman, supra; Syres v. Local 23, Oil Workers Int'l Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, reversing 5 Cir., 223 F. 2d 739.

### Right to Sue

*A. Do plaintiffs have a right to enforce arbitration under the collective bargaining agreement?*

■ The adjustment of grievances is as much a part of the process of collective bargaining as the negotiation of an agreement, N.L.R.A. sec. 8(d), 29 U.S. C.A. § 158(d). It is part of the function of a collective bargaining representative, and the employer has the same duty to bargain collectively over grievances as over the terms of the agreement. The agreement to arbitrate grievance disputes is the quid pro quo of an agreement not to strike. Textile Workers v. Lincoln Mills, 353 U.S. at page 455, 77 S.Ct. 912.

■ A union's right to screen grievances and to press only those it concludes should be pressed is a valuable right, and on balance it benefits all employees. Professor Cox has pointed out [3] that there are "strong reasons for concluding that the bargaining representative ought to have power under a broad industrial agreement to control the prosecution of claims for breach of contract, whether by pressing grievances, invoking arbitration, or instituting legal proceedings". 69 Harv.L.Rev. at 625. The pertinent reasons may be summarized as follows:

■ A prime function of a grievance procedure is to secure uniformity in interpreting the agreement and building up a "law of the plant" with respect to matters not spelled out in the agreement. In grievances arising out of problems not foreseen at the time of contract negotiations, although the issue is nominally framed by the past, the important question is often what rule shall govern the parties' conduct in the future. The group may be affected by future implications of the ruling to an extent that far outweighs the individual's claim for damages. Vesting the Union with control of all grievances increases the likelihood of uniformity and reduces "a potential source of competitions and discriminations that could be destructive of the entire structure of labor relations in the plant".[4] It prevents dissident minorities from pressing real or imagined griev-

---

3. Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601; Cox, Individual Enforcement of Collective Bargaining Agreements, 8 Lab.L.J. 850.

4. Douglas Aircraft, 25 War Lab.Rep. 57, 64–65.

ances in an effort to squeeze the last drop of competitive advantage out of each grievance. Allowing an individual to compel arbitration whenever he is dissatisfied with the company-union adjustment would discourage day-to-day cooperation between union and company in which grievances are treated as problems to be solved. Public officials and arbitrators, as well as employers, constantly remind union officials that they have a duty to discountenance disruptive and frivolous claims. If they are to accept this responsibility, union officials should be given the power to make their decisions effective.

■ Professor Cox concludes that the untrammeled individual enforcement of collective bargaining agreements would hamper the growth of sound labor-management relations. The courts have supported this conclusion. "The philosophy of the Union in retaining control over disputes and of the Company in requiring the same is sound. A contrary procedure which would allow each individual employee to overrule and supersede the governing body of the Union would create a condition of disorder and instability which would be disastrous to labor as well as to industry." United States v. Voges, D.C.E.D.N.Y., 124 F.Supp. 543, 546–547, quoting from Bianculli v. Brooklyn Union Gas Co., Sup., 115 N.Y.S. 2d 715, 718. In Taschenberger v. Celanese Corporation of America, 26 Lab.Cas. par. 68, 585 (Circuit Court for Allegany County, Maryland, 1954), Judge George Henderson granted summary judgment for defendant-employer on the ground that plaintiff-employee had no right to demand arbitration or to bring suit for loss of employment, because the collective bargaining agreement did not so provide, and plaintiff "had such remedies, and only such remedies, as the agreement gave him * * *."

In Jenkins v. William Schluderberg-T. J. Kurdle Co., 217 Md. 556, 144 A. 2d 88, the Court of Appeals of Maryland said: " * * * we are of the opinion that the rule suggested by Professor Cox, referred to above, is sound. This is that as a general rule grievance procedures provided by a collective bargaining agreement should be a bar to suits by individuals against the Employer based upon alleged violations of the agreement, but that such suits are not barred if the Union acted unfairly towards the employee in refusing to press the employee's claim through to, and including, arbitration under the collective bargaining agreement." 217 Md. at page 575, 144 A.2d at page 99.

■ The Agreement in this case is a comprehensive document covering all the usual aspects of labor-management relations. It contains explicit provisions regarding the procedures to be followed in discharging employees and in disposing of claims arising out of a discharge. Article XII provides that Bethlehem, before discharging an employee, shall give him written notice of its intention. The employee may then request a hearing before an official of the company. Such a hearing was held in the instant cases. The proviso in N.L.R.A. sec. 9(a), 29 U.S.C.A. § 159(a), requires no more, if it requires that. Cox, op. cit., 69 Harv. L.Rev. at 624. If after such a hearing the employee is discharged, he may file a written grievance, to be handled under the regular grievance procedure provided for in Article XI.

■ After the employee has filed a grievance concerning his discharge, the Union has the sole right to process the grievance. The discussions provided for in "Step 3" are between the Management's Representatives and the Grievance Committee and a representative of the Union. Nevertheless, in the instant cases, at the Step 3 meeting plaintiffs and their counsel were present as well as the Union, and were permitted to state their position. The agreement provides for no further appeal by an individual employee; appeals to further steps must be taken by the Union. "Step 4" is also a meeting between Company and Union representatives, held at the Company's headquarters in Bethlehem, Pennsylvania, regardless of where the grievance arose. The presence of the

grievants is not contemplated. Both the Company and the Union made it clear to plaintiffs that the hearing in the nature of a Step 4 meeting which was accorded to them was a matter of grace and not of right. The Agreement contains no provision for arbitration at the request of an individual employee. Only the Union (or the Company) is given the right to demand arbitration under the Agreement. Under such an agreement an individual employee cannot enforce arbitration of such a claim as plaintiffs are now pressing, at least unless it is shown that the Union has violated its duty of fair representation.

The propriety of the Union's conduct in the instant cases will be discussed under "C" below.

B. *Do plaintiffs have a right to sue Bethlehem for damages?*

The collective bargaining agreement does not contain any express, affirmative statement that the only remedies which employees covered by it shall have against Bethlehem for alleged breaches of the agreement shall be through the grievance procedures provided thereby. Such a limitation, however, is implicit in the agreement. In Jenkins v. William Schluderberg-T. J. Kurdle Co., 217 Md. at pages 563–564, 144 A.2d at page 92, the Maryland Court quoted with approval the conclusion of the late Dean Shulman: "The arbitration is an integral part of the system of self-government. And the system is designed to aid management in its quest for efficiency, to assist union leadership in its participation in the enterprise, and to secure justice for the employees. It is a means of making collective bargaining work * * *. When it works fairly well, it does not need the sanction of the law of contracts or the law of arbitration. It is only when the system breaks down completely that the courts' aid in these respects is invoked. But the courts cannot, by occasional sporadic decision, restore the parties continuing relationship; and their intervention in some cases may seriously affect the going systems of self-government." Shulman, Reason, Contract and Law in Labor Relations, 68 Harv.L.R. 999, at 1024.

The Maryland Court continued: "We think that under the provisions of the agreement now before us the Employer is generally entitled to immunity from suits by individual employees, that the Union is to consider carefully and fairly the alleged grievances of its members, that it is likewise to exercise its judgment and discretion fairly on behalf of its individual members in determining upon what terms it believes any grievances of theirs should be adjusted and whether such grievances should be carried to arbitration, if negotiations for settlement or adjustment fail. It is conceded in the present case that, but for the prohibition against unjust discharge contained in the collective bargaining agreement, the plaintiff would have no claim at all against the Employer. We think that she must take the bitter with the sweet and cannot select and rely upon one provision * * * which is to her advantage and at the same time reject or ignore another condition which limits or is a condition to the exercise of the provision which she invokes." 217 Md. at page 564, 144 A.2d at page 92.

The Maryland court concluded, however, that the plaintiff was not barred from bringing suit where, on the facts alleged and admitted by the demurrer, the union had acted arbitrarily and in a discriminatory manner in refusing to press the plaintiff's grievance to arbitration under the agreement. The Maryland court left open the question what the remedy should be.

Applying the Jenkins doctrine to the instant cases, plaintiffs cannot sue Bethlehem for their allegedly wrongful discharge unless the Union acted arbitrarily or in a discriminatory manner in refusing to press plaintiffs' grievances to arbitration under the Agreement, and thereby breached its duty of fair representation. This is the same issue which controls plaintiffs' claims against the Unions. See also Parker v. Borock, 5 N.Y.2d 156, 182 N.Y.S.2d 577, 156 N.E.2d 297, especially the concur-

ring opinion of Fuld, J., 5 N.Y.2d at page 162, 182 N.Y.S.2d at page 581, 156 N.E.2d at page 300.

*C. Did the Union violate any duty it owed to plaintiffs?*

The grievance machinery created by the Agreement implies that it will be invoked in good faith. The Agreement provides that "an earnest effort shall be made" to settle grievances promptly, and expresses the parties' intention that the grievance procedure, "if followed in good faith by both parties, shall be adequate to reach a fair and expeditious settlement of any grievance."

The grievance procedure can be an effective method of preserving peaceful industrial relations only so long as both the Union and the Company act in good faith. The employer expects and demands that the Union "screen" grievances, and the Union must do so if it wants the grievance procedure preserved and future grievances fairly considered by the employers.

In the handling of grievances, as in the negotiation of the terms of an agreement, the interests of all employees are involved. The principal purpose of the grievance procedure is not to provide a framework within which individual desires and complaints can be taken up with the employer; rather, it is to provide a framework within which the employees may *bargain collectively* to determine how the general principles of the agreement are to be applied to day-to-day problems.

The settlement of each grievance—whether voluntarily or by arbitration—establishes a precedent which will usually be followed in subsequent cases. When the Union takes up a grievance, therefore, it must be careful to present as strong a case as possible, not only for the sake of the employees immediately involved, but also to avoid setting a bad precedent which might later prejudice other employees with similar grievances.

The right of a union to exercise its discretion in refusing to process a grievance has been confirmed by the courts. The Supreme Court of Michigan has recently held: "The essence of the plaintiffs' complaint is really that the union failed to accept plaintiffs' position upon this grievance * * * [T]he contract makes amply clear that union representatives have discretion to receive, pass upon and withdraw grievances presented by individual employees. Our Court has repeatedly held that proper exercise of such discretion over grievances and interpretation of contract terms in the interest of all its members is vested in authorized representatives of the union, subject to challenge * * * only on grounds of bad faith, arbitrary action or fraud." Cortez v. Ford Motor Co., 1957, 349 Mich. 108, 84 N.W.2d 523, 529.

See also Jenkins v. William Schluderberg-T. J. Kurdle Co., 217 Md. 556, 144 A.2d 88; Mello v. Local 4408, C.I.O. United Steelworkers, 82 R.I. 60, 105 A. 2d 806; United States v. Voges, D.C.E. D.N.Y., 124 F.Supp. 543; Terrell v. Local Lodge 758, Int'l Ass'n of Machinists, 141 Cal.App.2d 17, 296 P.2d 100; Bianculli v. Brooklyn Union Gas Co., 115 N.Y.S.2d 715.

The Union has a "duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 232, 89 L.Ed. 173; Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681; Syres v. Local 23, Oil Workers Int'l Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, reversing 5 Cir., 223 F.2d 739. When an employee alleges a breach of a union's duty of fair representation, the test to be applied by the court is whether the action of the union was within "a wide range of reasonableness" and was taken in "good faith and honesty of purpose". Ford Motor Co. v. Huffman, 345 U.S. at page 337, 73 S.Ct. at page 686,

Plaintiffs have alleged that the Union's refusal to process their grievances was "arbitrary, capricious, malicious, and

794

without cause" and that it was based "solely upon" their "invocation of * * the Fifth Amendment." Unlike Jenkins however, the instant cases are not before the court on motion to dismiss the complaint. All parties have asked for summary judgment on the elaborate stipulations, affidavits and exhibits filed in the cases.

 The affidavit of David J. McDonald, International President of the Union, which is uncontradicted, shows that the Union has consistently followed the policy that the mere fact that a man has been a member of the Communist Party in the past is not sufficient to justify his discharge, but that the extent of his past activity and his present attitude are factors which should be considered. The Union owes a duty, not only to its membership, but also to the Company and all its employees, not to press grievances which are without merit. Cox, op. cit.; Shulman, op. cit. Plaintiffs refused to give the Union or its counsel the information which was essential to such an evaluation of their grievances. Under these circumstances the Union was clearly justified in refusing to press the grievances to arbitration.

There are no facts from which a court or a jury could reasonably infer that the Union acted arbitrarily, capriciously, maliciously, without cause, or in a discriminatory manner.

This finding disposes of the claims against Bethlehem as well as the claims against the Union. It is not necessary to decide whether Bethlehem had just cause for discharging the plaintiffs. If it were necessary to decide that question, I would find that the undisputed facts in these cases show just cause for the discharge. In re Bethlehem Steel Co. & United Steelworkers of America (CIO), 24 Lab.Arb.Reps. 852; Ostrofsky v. Maryland Empl. Sec. Bd., 218 Md. 509, 147 A.2d 741; Ault v. Unemp. Comp. Bd. of Rev., 188 Pa.Super. 260, 146 A.2d 729; Garner v. Los Angeles Board, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317; Beilan v. Board of Education, 357 U.S.

399, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1324, 2 L.Ed.2d 1433.

Defendants' motions for summary judgment are hereby granted.