Fred THOMPSON, Appellant,

v.

BROTHERHOOD OF SLEEPING CAR
PORTERS, an Unincorporated Railroad
Labor Organization, National in Scope,
Appellee.

No. 8729.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 12, 1962.

Decided March 22, 1963.

Richard G. Dusenbury, Florence, S. C. (Dusenbury, Dusenbury & McKenzie, Florence, S. C., on brief), for appellant.

Joseph L. Nettles, Columbia, S. C. (F. Ehrlich Thomson, Columbia, S. C. and Delson, Levin & Gordon, New York City, on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

Does invidious discrimination, not based on race, furnish ground for a complaint in a federal court against a labor union by a person it is statutorily empowered to represent? The question arises on this appeal of plaintiff Thompson from an order of the District Court granting a motion to dismiss and directing a verdict for the defendant, Brotherhoood of Sleeping Car Porters.

Initiated on October 18, 1958,[1] in the Court of Common Pleas of Florence County, South Carolina, the action was removed to the federal District Court. There the defendant moved to quash service, and on June 16, 1960, the motion was denied pending the trial, but the question of service has not been pursued in this court. The trial was begun before a petit jury on December 11, 1961, and the verdict for the defendant was di-

1. We note the unhappy fact that this litigation was begun more than four years ago, a circumstance for which the District Judge who tried the case was in no way responsible, for, since his appointment as judge, substantial progress has been made in clearing the congested docket at Florence.

rected at the conclusion of the plaintiff's case on December 13, 1961.[2]

The complaint appears on its face to raise both federal and state causes of action. The theory of the federal cause of action was not explicated until late in the trial, and then never very clearly; but the crux of Thompson's allegations is that the Brotherhood was remiss in fulfilling its obligation, under the collective bargaining agreement between it and the Atlantic Coast Line Railroad and *under the Railway Labor Act,* 45 U.S.C.A. §§ 151–164, 181–188, "to represent the Plaintiff in claims and grievances against the 'Railroad' and to protect the seniority rights of the Plaintiff as provided for by the Agreement setting forth said rights."[3] Only on review of the evidence does it begin to appear that the federal claim Thompson has attempted to present is that the Brotherhood discriminated against him in failing to prosecute conscientiously his claims to seniority, because he was not constant in his union membership. Thereby, says the plaintiff, the Brotherhood breached its statutory duty to represent him fairly and in good faith.

The plaintiff claimed that the acts of the Brotherhood caused him to lose his seniority as a Mail Porter, with resulting deprivation of his rightful tours of duty and opportunities for employment with the Railroad. He sought actual damages of $10,000 for past losses, plus allowance for such losses as might accrue pending a final determination, as well as punitive damages of $75,000.

### FACTS

Thompson came to work for the Railroad in 1946. Until 1948, when he was given a regular assignment as a Train Porter (the higher classification), he worked "off the extra board" both as Mail and as Train Porter. He asserts that he also made occasional runs as a Mail Porter in 1951, 1953 and 1955. Although first listed on the Train Porters' Seniority Roster on January 1, 1947, with seniority from January 18, 1946, the date of his initial run, he was not listed on the Mail Porters' Seniority Roster until January 1, 1957, with seniority from October 22, 1956. The delay in his listing on the Mail Porter roster occurred despite the apparently established practice under the collective bargaining agreements in effect from 1944 through 1956[4] for a man to

2. The District Court's written order was signed on December 19, 1961. This court has looked not only to it but also to the court's oral explanation to the jury and to colloquies between court and counsel to ascertain the reasons for the disposition made.

3. Specific allegations were made to the effect that the Brotherhood:

"[F]ailed to negotiate in good faith with the railroad in establishing his seniority on the Mail Porters' Roster and that agents and officers of the defendant had fraudulently induced the plaintiff to sign waiver of his seniority rights by fraudulent misrepresentations, and that the defendant by its agents, officers, and members had fraudulently conspired to deny plaintiff his seniority rights."

4. *The 1944 agreement* provided that:
"*Rule 2:*
"(c) Separate seniority rosters will be prepared for each classification, i. e., train porters, mail porters * * *.

Seniority of each employe shall begin as of the date of employment in his respective classification. Rosters will be posted in January of each year * * *. Changes will not be made in seniority rosters except upon protest filed within sixty (60) days from date of posting, it being understood that this sixty-day (60) period applies only to the next year succeeding that in which any change has taken place which justified the filing of protest against the seniority standing of any employe shown on the roster, except that typographical errors which might occur in transcribing the seniority roster from one year to another will be corrected."
"*Rule 4:*
"Mail porters promoted to position of train porter will retain seniority as mail porter, and when displaced as train porters in reduction of forces, will be privileged to displace mail porters their junior in service as mail porters, and will retain their seniority

acquire seniority from the first day he worked in a given classification and to be listed on both rosters if he worked in both classifications.[5]

Thompson testified that he first received a copy of the Mail Porters' Seniority Roster in 1950 and only then discovered that he was not listed. Claiming seniority from 1948, he protested to the Trainmaster and then to the Chairman of the Brotherhood's Local Lodge. Nothing was done in his behalf. The reason assigned at the trial was that he had waived his right to seniority by not complaining within 60 days of the posting of the first roster listing Mail Porter seniority from 1948. See n. 4, supra. Subsequently, Thompson made persistent protests in 1952, 1953, 1954, 1955 and 1956 when the Mail Porters' Seniority Rosters were posted. In 1953, he apparently filed his first written complaint, still claiming seniority from 1948. He was unsuccessful in inducing action in his behalf by Railroad or by Local or

International Brotherhood personnel, ostensibly because he was said to have waived his rights by failing to raise timely complaint.

In 1956 the job of Train Porter was in the process of being abolished in Thompson's district. Only then, after more than five years of repeated complaints, was a conference arranged between Thompson and representatives of the Brotherhood and of the Railroad. The evidence shows that the Railroad was agreeable to whatever arrangement its employees and the union might reach. At the conclusion of the conference, the Railroad agreed to a proposal to establish Thompson's seniority as Mail Porter from 1948. This proposal, however, was subject to the condition that the men who would thereby be made junior to Thompson would agree. This they refused to do. Thompson then asserted a specific claim to seniority as of 1953. Another conference was held on October 22, 1956. The Railroad accepted a proposal to estab-

as train porter provided they return to train porter's position at first opportunity."

*The 1954 agreement* provided that:
"*Rule 4:*
"(a) Seniority of each employe shall begin as of the date of employment in his respective classification * * *.
* * * * *
"(d) Separate seniority rosters will be prepared for each classification; i. e., Train Porters, Mail Porters * * *. Rosters will be posted in January of each year. * * * Changes will not be made in seniority rosters except upon protest filed within sixty (60) calendar days from date of posting. Upon presentation of proof of error by an employe or his representative, such error will be corrected. Typographical errors which might occur in transcribing the seniority roster from one year to another will be corrected.
* * * * *
"(g) Train and Mail Porters may be used interchangeably. Mail Porters assigned to the position of Train Porter will retain seniority as Mail Porter and will begin to accumulate seniority as Train Porter from the date first assigned."
"*Rule 5:*
"(a) Mail Porters promoted to position of Train Porter will retain sen-

iority as Mail Porter and when displaced as Train Porter in reduction of forces will be privileged to displace Mail Porters their junior in service as Mail Porters, and will retain their seniority as Train Porter, provided they return to Train Porter position at first opportunity; otherwise they will forfeit their seniority as Train Porter."

5. On appeal, counsel for the defendant contended that seniority would not accrue until an employee had a regular assignment in the given category. The testimony on this point was in conflict. Thompson, however, was in fact listed on the Train Porters' Seniority Roster before he was regularly assigned, when he still worked "off the extra board" both as Train and as Mail Porter. In addition, the seniority rosters introduced in evidence show that J. G. Reed was credited with both Train and Mail Porter seniority as of December 18, 1947, and R. A. Anderson was credited with seniority in both categories as of November 15, 1950, which was the very date he entered the Railroad's service. At least until explained otherwise, the above roster entries might properly be interpreted by the trier of facts as demonstrating that an individual could be listed simultaneously on both rosters without holding regular jobs in both categories.

lish Mail Porter seniority as of 1953, but again the proposal was coupled with the condition that the men who would be made junior should agree. Again they refused.

On November 7, 1956, A. Philip Randolph, President of the Brotherhood, wrote the Superintendent of the Railroad suggesting that Thompson be placed on the Mail Porters' Seniority Roster with seniority from October 22, 1956, making him the "youngest" Mail Porter on that roster. On November 16th, Randolph wrote Thompson advising him to agree to this settlement and to waive his more ambitious claims. On November 26th, Randolph informed the Superintendent that Thompson had agreed to the waiver and settlement.

Despite his having been placed on the Mail Seniority Roster, Thompson soon found that, since he was the "youngest" on the list, he was rarely in line to make runs. In 1958 he made no runs at all; by 1961 his name no longer appeared on either the Mail or Train Porters' Seniority Roster.

### Evidence of Discrimination

There is no intimation in the record that racial considerations entered the case, but at the trial the plaintiff adduced substantial evidence tending to show that, because he adhered to the Brotherhood as a member only occasionally and not regularly, it discriminated against him in processing and securing his seniority rights, or rather in failing to represent him properly in these matters. Thompson himself testified that he had joined the Brotherhood for a short period sometime between 1952 and 1954 only after warnings by the local chairman and an international organizer that he "would have to be in the union before they could do anything to help" him. Although he also testified that he was a member for three months in 1951 and again briefly in 1956, he claimed that he joined on each occasion because the Brotherhood made it clear that this was the only way to gain its help in obtaining the seniority rights to which he was entitled.

A. J. Pringle, Secretary-Treasurer of the Local for six or seven years prior to the trial and Acting Chairman at the time of the trial, gave extensive testimony which strongly indicates a general policy of the Brotherhood not to recognize full responsibility as representative of a man unless he was in the organization. He testified further that Thompson's lack of steady membership was one reason the union did not accord him wholehearted support in the pursuit of his seniority claims. The impact of Pringle's and Thompson's testimony was cogently corroborated by a letter of May 8, 1956, addressed to Thompson by B. F. McLaurin, International Field Organizer of the Brotherhood. He wrote:

*"I am sure you were aware that there was nothing I could do until you became a full fledged member; now that you have followed through on your responsibility, rest assured that we will do the same at this end.* I have instructed your local chairman to request a formal hearing on your case. I trust that you will cooperate in every way possible to get this case started in order that we may be able to process it into the Railroad." (Emphasis added.)

Nowhere in the record is the sharp point of this statement blunted.

Certain unexplained circumstances have a further bearing on the accusation of improper discrimination.

The Brotherhood claims that Thompson was the author of his own misfortune. It says that in not raising his grievances formally within the time limited by the collective bargaining agreements, he waived his claims to seniority. See n. 4, supra. The Brotherhood does not, however, explain how it happened that four other employees, who according to its argument likewise would appear to have failed to make timely claims, nevertheless

were not deemed to have waived their rights to seniority.[6]

The Brotherhood's position is that not until 1956 did Thompson in specific language articulate his claim to seniority as of 1953 (and his claim to seniority as of 1955 not until the trial) and therefore, under a literal reading of the collective bargaining agreements, he waived these rights. Yet the record is barren of any legitimate circumstance to explain why the Brotherhood, put on notice by Thompson's determined insistence that he was entitled to seniority from 1948, was not itself moved earlier to secure him seniority rights, at least as of 1953 or 1955. The Brotherhood now interposes an expression of concern for several individuals whose seniority rights it permitted through its inaction, according to Thompson, to intervene ahead of him.

## THE DISTRICT COURT'S RULING

The District Court recognized as a matter of law that the Brotherhood "owes the obligation to all the employees that they represent—to represent each and every employee regardless of whether he belongs to the union or not * * * [and that] the union owes the obligation to represent in good faith, that is, not to show partiality to one employee as against another employee in their representation of the respective employees." The District Court nevertheless directed a verdict for the defendant and dismissed the case at the close of the plaintiff's testimony.

First, the court appropriately observed that, under the Railway Labor Act, it was not empowered to "pass upon the question of whether the seniority rights were rightly or wrongly concluded." But then it added:

"In order for this plaintiff to have a cause of action under the theory that he has brought his action here, he in effect would have to affirmatively, by competent testimony in this case, establish fraud on the part of the union in its dealings with him as an individual."

Treating Thompson's specific allegations of fraud and deceit, conspiracy, and misrepresentation as an attempt "to make out a case under the theory of fraud," the court, "operating under the law of South Carolina," concluded that the plaintiff had failed to make out a case. In its order the court stated:

"At the conclusion of plaintiff's evidence, defendant moved for dismissal or directed verdict in its favor upon several specified grounds. The only one necessary for decision here being that there is no evidence upon which it could reasonably be found that the defendant has been guilty of the misconduct alleged in the complaint."

It is not clear whether the court meant by this that, having first disposed of a federal cause of action, it was now dealing, either under the doctrine of pendent jurisdiction[7] or under diversity jurisdiction, with a state cause of action, or that it was treating a federal cause of action under the impression that it was governed by state law. Whatever may have been its reasoning, we are compelled to the conclusion that the court erred in its treatment of the federal cause which arises under the Railway Labor Act.

---

6. According to the seniority rosters in evidence: J. G. Reed was first credited with Mail Porter Seniority from December 18, 1947, on the roster of July 1, 1953; R. A. Anderson was first credited with both Mail and Train Porter Seniority from November 15, 1950, on the roster of July 1, 1953; Amos Maxwell was first credited with Train Porter Seniority from April 15, 1953, on the "revised" roster of July 1, 1955; and Joe Singletary, Jr., was first credited with Train Porter Seniority from October 14, 1955, on the roster of January 1, 1957.

7. See, e. g., Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) ; Hart & Wechsler, The Federal Courts and the Federal System, "Note on Pendent Jurisdiction," 802–09 (1953).

Either it mistakenly concluded that the plaintiff did not sufficiently allege or offer proof of a federal right within the jurisdiction of the court to protect, or it improperly concluded that plaintiff's federal right could not be sustained without proof of fraud under state law.[8]

## THE DUTY OF FAIR REPRESENTATION

Paradoxically, it is Thompson who questions whether he has properly stated and offered proof of a federal cause of action. He argues in the alternative: First he insists that the case was improvidently removed. Not only, says he, is there no diversity of citizenship but there is no justiciable federal question because, unlike the cases of Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), the Brotherhood has not been accused of racial discrimination. As we understand it, however, his argument then continues: if there is federal jurisdiction, he has proved a prima facie case of "invidious discrimination" in breach of the Brotherhood's statutory duty of fair representation, a duty first recognized in the Steele decision. It is with the appellant's second proposition that we agree.

As this court recently had occasion to say, "[i]t is well established that, under both the Railway Labor Act and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., a bargaining agent must fairly and without discrimination represent all employees in the bargaining unit, and that employees discriminatorily treated have recourse to the federal courts." Hostetler v. Brotherhood of Railroad Trainmen, 287 F.2d 457, 458 (4th Cir., 1961), cert. denied, 368 U.S. 955, 82 S.Ct. 397, 7 L.Ed.2d 387 (1962). Characterized as the duty of fair representation, the bargaining agent's obligation arises under the federal labor acts. Professor Summers has observed: "The source of the union's duty to the individual is * * * its statutory power to bargain and make binding agreements which in fact govern the individual's employment."[9] Initially formulated in class actions involving racial discrimination in the negotiation of collective bargaining agreements,[10] the duty of fair representation has been held to extend as well to the administration of collective agreements.[11] Furthermore, the jurisdiction of the National Railroad Adjustment Board to resolve "[t]he disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements con-

---

8. Although we find error, we readily sympathize with the District Judge's predicament. As he tersely observed about the conduct of this litigation: "The thing has been poorly handled * * *." The brief filed by the plaintiff in this court makes the Judge's comment understandable. There is no adequate discussion of the considerable body of law relating to the federal cause of action for breach of a union's statutory duty of fair representation. Nor did the defendant's brief fill the gap.

9. Summers, "Collective Power and Individual Rights in the Collective Agreement—A Comparison of Swedish and American Law," 72 Yale L.J. 421, 432 (1963).

10. Steele v. Louisville & Nashville R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood of Loco-

motive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952). See Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955).

11. Conley v. Gibson, 355 U.S. 41, 46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957); see, e. g., Dillard v. Chesapeake & O. Ry. Co., 199 F.2d 948, 950–951 (4th Cir., 1952); Richardson v. Texas & N. O. R. R., 242 F.2d 230, 234 (5th Cir., 1957); see also, Ostrofsky v. United Steelworkers, 171 F. Supp. 782, 793–794 (D.Md.1959), aff'd per curiam, 273 F.2d 614 (4th Cir.), cert. denied, 363 U.S. 849, 80 S.Ct. 1628, 4 L. Ed.2d 1732 (1960).

cerning rates of pay, rules, or working conditions * * *," 45 U.S.C.A. § 153 First (i),·is not a bar to employees' court actions "against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining." [12]

At a relatively early stage in the development of this doctrine, this court expressed the opinion that the judicially enforceable duty of fair representation was limited to cases involving racial discrimination and that the National Railroad Adjustment Board was the proper body to resolve claims of non-racial discrimination.[13] Yet in Hostetler, supra,

we expressly recognized the duty of fair representation and examined, without reference to the earlier decisions in our circuit, an alleged breach of the duty that was wholly unrelated to race.

■ An overwhelming body of judicial opinion and learned commentary, appearing principally after Alabaugh v. Baltimore & O. R. R. n. 13, supra, now persuades us that that decision represents too narrow a view. The Supreme Court's adjudications touching this judicially enforceable statutory duty [14] should be interpreted as also prohibiting invidious discrimination that is not based upon race.[15] At least in the absence of a valid

12. Conley v. Gibson, 355 U.S. 41, 44–45, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). See, e. g., Cunningham v. Erie R. R., 266 F.2d 411, 414–417 (2d Cir., 1959) ; Richardson v. Texas & N. O. R. R., 242 F.2d 230, 234 (5th Cir., 1957) ; Mount v. Grand International Bhd. of Locomotive Engineers, 226 F.2d 604, 607–608 (6th Cir., 1955) ; Dillard v. Chesapeake & O. Ry. Co., 199 F.2d 948, 951–952 (4th Cir., 1952) ; Choate v. Grand International Bhd. of Locomotive Engineers, 159 Tex. 1, 4–7, 314 S.W.2d 795, 797–799 (1958).

13. Alabaugh v. Baltimore & O. R. R., 222 F.2d 861, 866–867 (4th Cir.), cert. denied, 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748 (1955); Spires v. Southern Ry. Co., 204 F.2d 453, 456–457 (4th Cir., 1953); see also, Chapman v. Local 104, International Ass'n of Machinists, 199 F.Supp. 186, 188–190 (S.D.W.Va. 1961).

14. See n. 10 and n. 11, supra, and n. 15, infra.

15. Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 776, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952) (Minton, J. joined by Vinson, C. J. and Reed, J., dissenting on other grounds); Ferro v. Railway Express Agency, Inc., 296 F.2d 847, 850–851 (2d Cir., 1961) ; Latham v. Baltimore & O. R. R., 274 F.2d 507, 512–513 (2d Cir., 1960) ; Cunningham v. Erie R. R., 266 F.2d 411, 415–416 (2d Cir., 1959); Peterson v. Brotherhood of Locomotive Firemen, 272 F.2d 115, 118–119 (7th Cir., 1959) (dictum); Mount v. Grand International Bhd. of Locomotive Engineers, 226 F.2d 604, 607–608 (6th Cir., 1955), cert. denied, 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839 (1956); La-France v. Brotherhood of Locomotive

Firemen, 204 F.Supp. 13, 14 (E.D.Mich. 1962); Nobile v. Woodward, 200 F.Supp. 785 (E.D.Pa.1962); Brady v. Trans World Airlines, Inc., 196 F.Supp. 504, 506–507 n. 6 (D.Del.1961); 174 F.Supp. 360, 363 (D.Del.1959); 167 F.Supp. 469, 473–474 (D.Del.1958); Gainey v. Brotherhood of Railway Clerks, 177 F.Supp. 421, 430–431 (E.D.Pa.1959), aff'd, 275 F. 2d 342, 345 (3d Cir.) (question reserved), cert. denied, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); Cherico v. Brotherhood of Railroad Trainmen, 167 F.Supp. 635, 636–637 (S.D.N.Y.1958); Hargrove v. Brotherhood of Locomotive Engineers, 116 F.Supp. 3, 7–9 (D.D.C.1953); Milstead v. Atlantic Coast Line R. R., 273 Ala. 557, 562–564, 142 So.2d 705, 709–711, cert. denied, 371 U.S. 892, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Choate v. Grand International Brotherhood of Locomotive Engineers, 159 Tex. 1, 4–6, 314 S.W.2d 795, 798–799 (1958); Crowell v. Palmer, 134 Conn. 502, 508–510, 58 A.2d 729, 732–733 (1948).

See Ford Motor Co. v. Huffman, 345 U.S. 330, 336–338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Wallace Corp. v. N. L. R. B., 323 U.S. 248, 255–256, 65 S.Ct. 238, 89 L.Ed. 216 (1944); Trailmobile Co. v. Whirls, 331 U.S. 40, 67–70, 67 S.Ct. 982, 91 L.Ed. 1328 (1947) (Jackson and Frankfurter, JJ., dissent on other grounds); Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 185 (9th Cir.), cert. denied, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962); Hughes Tool Co. v. N. L. R. B., 147 F.2d 69, 74 (5th Cir., 1945); Durandetti v. Chrysler Corp., 195 F.Supp. 653 (E.D.Mich. 1961); Ostrofsky v. United Steelworkers, 171 F.Supp. 782, 793–794 (D.Md.1959), aff'd per curiam, 273 F.2d 614 (4th Cir.), cert. denied, 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d

union shop agreement—there is no such agreement here—disparate treatment in representation cannot be tolerated when based on the disadvantaged individual's or group's non-membership in the statutory bargaining agent. Such disparity in treatment constitutes a conspicuous example of forbidden discrimination that is not necessarily related to race. Depending upon the facts, it may violate the bargaining agent's statutory duty of fair representation.[16] A union has no more justification to discriminate injuriously in its representation on the ground of non-membership, or instability of membership, or even because of persistent and vocal complaints or other obnoxious behavior, than it has to discriminate on account of skin pigmentation. None of these circumstances is relevant to the fair and proper discharge of a union's duty to those it is empowered to represent and whose employment is governed by its binding agreements.

■■■ Although the District Court correctly concluded that it was without general power to review the correctness of the seniority rights accorded to the plaintiff, sufficient, even if inartful, allegations were made of a claim that the Brotherhood breached its statutory obligation to represent him fairly and to accord him equality with Brotherhood members in respect to his seniority rights as a Mail Porter. Litigation of this particular claim, merely seeking damages from the Brotherhood, involves only incidentally a consideration of the collective bargaining agreements and Thompson's seniority rights. See Conley v. Gibson, 355 U.S. 41, 44–45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■■ We have been admonished that to "adequately set forth a claim upon which relief could be granted," it is not necessary that the claim be well developed in the complaint for "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Conley v. Gibson, supra at 45–46, 78 S.Ct. at 101–102, 2 L.Ed.2d 80. It cannot be said that Thompson's complaint is deficient under this test.

■■■ Thompson's theory posits a federal right, and therefore federal rather than state law governs.[17] State law may sometimes provide useful guides in deter-

1732 (1960); Berman v. National Maritime Union, 166 F.Supp. 327, 331–332 (S.D.N.Y.1958).

See also, Aaron, "Some Aspects of the Union's Duty of Fair Representation," 22 Ohio St.L.J. 39 (1961); Cox, "Rights Under a Labor Agreement," 69 Harv.L. Rev. 601, 632 (1956); Cox, "The Duty of Fair Representation," 2 Vill.L.Rev. 151, 159–160 (1957); Cox, "Individual Enforcement of Collective Bargaining Agreements," 8 Lab.L.J. 850, 858 (1957); Gregory, "Fiduciary Standards and the Bargaining and Grievance Process," 8 Lab.L.J. 843, 844–848 (1957); Smythe, "Individual and Group Interests in Collective Labor Relations," 13 Lab.L.J. 439 (1962); Summers, "Individual Rights in Collective Agreements: A Preliminary Analysis," 9 Buffalo L.Rev. 239, 243–248 (1960); Wellington, "Union Democracy and Fair Representation: Federal Responsibility in a Federal System," 67 Yale L.J. 1327, 1335–1336 (1958).

16. See, e. g., Crowell v. Palmer, 134 Conn. 502, 58 A.2d 729 (1948); Cox, "Rights Under a Labor Agreement," 69 Harv.L. Rev. 601, 632–633 (1956); Cox, "The Duty of Fair Representation," 2 Vill.L. Rev. 151, 160, 167–168 (1957); cf., e. g., Wallace Corp. v. N. L. R. B., 323 U.S. 248, 255–256, 65 S.Ct. 238, 89 L.Ed. 216 (1944); Hughes Tool Co. v. N. L. R. B., 147 F.2d 69, 74 (5th Cir., 1945); International Union of Electrical Workers, Local 801 v. N. L. R. B., 113 U.S.App.D. C. 342, 307 F.2d 679, 683, cert. denied, 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962).

17. See Steele v. Louisville & Nashville R. R., 323 U.S. 192, 204, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Cf. Dice v. Akron, Canton & Youngstown R. R., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456–457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); but cf., Pekar v. Local 181, International Union of United Brewery Workers, 311 F.2d 628, 638 (6th Cir., 1962).

mining this federal right. Cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). But in this case, to speak in terms of "fraud and deceit," "conspiracy," and "misrepresentation"—state common law concepts—is not particularly useful and is misleading. The Supreme Court has, in fact, already enunciated the broad doctrinal standards for determining whether the duty of fair representation has been breached. "[H]ostile discrimination," "invidious" discrimination or "discriminations not based on * * * relevant differences" is prohibited.

> "This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit."

Steele v. Louisville & Nashville R. R., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944). But, any discrimination in treatment must be based upon relevant, non-invidious distinctions for, while "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, [it is] subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co.

v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

In the present case, it appears necessary to pursue only one line of inquiry to resolve the questions of "invidious discrimination," "reasonableness," "good faith and honesty": Did the plaintiff show that he received different or substantially sub-standard representation at the hands of the Brotherhood? If so, was it because of some improper reason, such as his unsatisfactory union status? Did this treatment cause him injury? If the answers of the trier of fact to the three questions are in the affirmative, the plaintiff is entitled to relief.

### The Defense of "Waiver and Settlement"

■ In its answer the Brotherhood interposed the defense that the plaintiff, by authorizing the Brotherhood to make an agreement with the Railroad acknowledging his Mail Porter seniority as of October 22, 1956, had entered into a "full accord and satisfaction for the claim alleged in the complaint, and that the plaintiff in so authorizing the defendant to act, waived his seniority rights."[18] In its brief the Brotherhood contends that "the record disproves the allegation [of coercion] of the complaint. The record shows only that the defendant advised plaintiff to accept the proposal that defendant had obtained from the Railroad in his behalf. He was not threatened, he was not cajoled. He was perfectly free to accept or not, as he wished. * * *"

We think the plaintiff is not barred from bringing this suit. His federal cause of action, as we have seen, is based on an alleged breach of the defendant's statutory obligation to represent him

18. In signing the "waiver," induced by Randolph's advice that if he did not agree to "give up any further complaint or claim regarding any Mail Porter's work [he] may have performed prior to October 22, 1956, * * * [he was] not likely to be placed on the Mail Porter's roster and there [would] be nothing more the Brotherhood [would] be able to do about it," Thompson stated that:

"Due to my dire need for work to support my family, I am accepting the proposition set forth by Superintendent Patterson, thus abandoning further complaint or claim regarding my mail porter's service with the Atlantic Coast Line Railroad Company prior to October 22, 1956, providing my name is placed on the mail porter's roster as of that date."

fairly. Although the Supreme Court has not explicitly characterized this obligation by the very term "fiduciary relationship," its treatment of the subject is tantamount thereto. It has in fact said that "[b]argaining agents who enjoy the advantages of the Railway Labor Act's provisions *must execute their trust* without lawless invasions of the rights of other workers." (Emphasis added.)[19] While it is not always appropriate to transplant common law concepts to the field of labor relations, it is plain that in the Supreme Court's view the federal statutory duty of fair representation is not unlike a common law fiduciary obligation.[20] It would be anomalous to bar as a matter of law the plaintiff's suit for an alleged breach of the union's "fiduciary obligation" because, finding himself in economic straits due to the "fiduciary's" alleged misfeasance, or nonfeasance, he executed, upon its advice, a waiver of rights that it should have secured for him. Cf. Restatement of the Law of Trust § 216–18 (2d. ed. 1959).

*Other Defenses: Intervening Rights and Role of the Railroad*

██ On the merits the defendant contends that in 1956 it did all that it could for the plaintiff, since (1) it had to protect the interests of other individuals whose seniority rights had intervened and to whom it also owed a duty of fair representation and (2) the Railroad, not the Brotherhood, administered seniority rights. Were the focus of attention only upon the Brotherhood's efforts in Thompson's behalf in 1956, it might be possible to conclude, as a matter of law, that its conduct did not fall short of its duty, for the intervening rights of other employees would be paramount. But the conferences conducted in 1956 must be examined in the light of events that according to Thompson occurred in the earlier years. The question as to the conferences is whether the Brotherhood in 1956 could or should have acted more positively to remedy its earlier omissions, if there were omissions as claimed.

In this regard, it is relevant not only that administration of seniority rights was subject to contract grievance procedures (see n. 4, supra), but also that there is evidence supporting the Railroad's insistence that it had little interest in the way the Brotherhood adjusted grievances involving the competitive interests of employees. The Railroad was

---

19. Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952).

See also, Trailmobile Co. v. Whirls, 331 U.S. 40, 68, 67 S.Ct. 982, 996, 91 L.Ed. 1328 (1947) (Jackson and Frankfurter, JJ., dissenting on other grounds).

"While the individual is thus placed wholly in the power of the union, it does not follow that union powers have no limit. Courts from time immemorial have held that those who undertake to act for others are held to good faith and fair dealing and may not favor themselves at the cost of those they have assumed to represent. The National Labor Relations Act, in authorizing union organizations 'for the purpose of collective bargaining or other mutual aid or protection,' 49 Stat. 452, § 7, 29 U.S.C. § 157, indicates no purpose to excuse unions from *these wholesome principles of trusteeship*." (Emphasis added.)

In Steele v. Louisville & Nashville R. R., 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944), the Court said:

"The fair interpretation of the statutory language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents. It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf, and that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed."

20. Cf. Cox, "Rights Under a Labor Agreement." 69 Harv.L.Rev. 601, 645–646, 652 (1956); Cox, "Individual Enforcement of Collective Bargaining Agreements," 8 Lab. L.J. 850, 853–854 (1957); Gregory, "Fiduciary Standards and the Bargaining and Grievance Process," 8 Lab.L.J. 843 (1957); Jenkins v. William Schluderberg-T. J. Kurdle Co., 217 Md. 556, 564–565, 574–575, 144 A.2d 88, 93, 98–99 (1958).

ruled in its attitude chiefly by a desire to maintain good relations with the Brotherhood. It was content to allow the Brotherhood to act as judge in the adjustment of seniority questions among the employees. The Brotherhood's role was not one of mere passivity.

In these circumstances, it could well be concluded that telling the plaintiff he could have his seniority rights, at least in part, provided they were acquiesced in by the very employees who stood to gain from withholding agreement, was less than the kind of support he had the right to expect from his representative. It may well be that if the Brotherhood declined in 1956 to take a more affirmative position to vindicate plaintiff's rights, which according to the plaintiff had been put in jeopardy by the Brotherhood's own earlier defaults, this would not be an adequate discharge of its duty as plaintiff's representative. It could not shield itself behind either the claim that technically the Railroad administers seniority rights, or that other employees' rights had intervened.

### Legal Effect of the Evidence

.We are in complete accord with the Sixth Circuit Court of Appeals' recent observation that in passing upon allegations charging that a union breached its duty of fair representation "[w]hether the bargaining representative has acted fairly and impartially and without hostile discrimination depends upon the facts of each case." Trotter v. Amalgamated Ass'n of Street Railway Employees, Div. 1303, 309 F.2d 584, 586 (6th Cir., 1962), cert. denied, 83 S.Ct. 936; Pekar v. Local 181, International Union of United Brewery Workers, 311 F.2d 628, 638 (6th Cir., 1962). The court concluded, in these cases, that there had been no factual demonstration of breach of the duty of fair representation. Upon the showing made in the instant case, however, it could reasonably be found that the plaintiff was not remiss in the assertion of his rights but from 1950 had made timely protests, repetitious to the point of monotony, to representatives of

the Railroad and of the Brotherhood. It could be found that the Brotherhood was unwilling to protect him equally with others it represented because he was a nonmember or only an occasional member. Upon the record, it could well be concluded that the Brotherhood, pursuing a policy, sometimes openly declared, of favoring its more loyal adherents, ignored the plaintiff's protests or presented them feebly with no genuine effort to establish his rights. In short, the testimony would support a finding that the Brotherhood's conduct evidenced a purpose not to press the plaintiff's complaints effectively, but to stifle them.

On the other hand, of course, the trier of facts could, in the choice made of the items of testimony to be believed and in their interpretation, accept the defendant's version and reach the opposite conclusion. Yet the record cannot be said to admit of that conclusion only. A verdict on the facts was called for rather than a determination as a matter of law.

Viewing the evidence most favorably to the plaintiff, and in the doctrinal framework examined above, it was sufficient to present a prima facie case of a breach of his federal right. Therefore, the District Court had federal question jurisdiction and the defendant should not have been nonsuited. Thompson is entitled to a new trial. Cf. Crowell v. Palmer, 134 Conn. 502, 58 A.2d 729 (1948).

### Amendment of Pleadings and Evidence at New Trial

At such new trial, the plaintiff should be permitted, as he requested in the District Court, to amend his complaint to plead 1953, 1955, or any other appropriate year as to which he can allege, in good faith, that had the Brotherhood acted with sufficient regard for his rights he would have been entitled and able to secure seniority as a Mail Porter. The "time tickets," offered in evidence but rejected below, and any other valid documentary proof that he made runs as a Mail Porter during the years covered by the amendment, or otherwise relating

to his seniority, should be admitted. At a minimum, such proof bears upon the question whether the Brotherhood had knowledge of the fact that Thompson may have been entitled to Mail Porter seniority as of dates other than 1948 or 1956. This in turn bears on the question whether the Brotherhood, put on notice by the plaintiff's unremitting pleas for seniority as of 1948, should have attempted to secure seniority for him as of 1953, 1955, or some other date earlier than October 22, 1956.[21]

Reversed and remanded for a new trial in accordance with the opinion of this court.

---

21. The court invites the attention of the parties and the District Court to another substantial question, in addition to those considered in this opinion, which will doubtless arise on retrial. May punitive damages be awarded in this action arising under the Railway Labor Act? This court abstains for the present from passing upon the question. It was not raised on appeal nor apparently in the District Court, but our research discloses that at least one district court has addressed itself to this issue. See Brady v. Trans World Airlines, Inc., 196 F.Supp. 504 (D.Del.1961). We note, in addition, that the Brady opinion also considered the question whether a jury trial is available in a suit to vindicate the statutory right of fair representation, at least, when the principal relief sought is injunctive. Again, we intimate no view as to this.