**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PENINSULA SHIPBUILDERS' ASSOCIATION, Respondent.**

**PENINSULA SHIPBUILDERS' ASSOCIATION, Cross–Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 78–1454, 78–1492 and 78–1559.**

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1979.

Decided June 5, 1980.

Edmund D. Cooke, Jr., Washington, D. C. (Ray J. Schoonhoven, Chicago, Ill., Andrew M. Kramer, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for Newport News Shipbuilding and Dry Dock Company.

E. D. David, Newport News, Va. (Jones, Blechman, Woltz & Kelly, Newport News, Va., on brief), for Peninsula Shipbuilders' Association.

Jay E. Shanklin, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for National Labor Relations Board.

Before HAYNSWORTH, Chief Judge, and WIDENER and HALL, Circuit Judges.

WIDENER, Circuit Judge:

Pursuant to § 10(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(f), Newport News Shipbuilding and Dry Dock Company (Newport News or the Company) has petitioned this court to review and set aside an order of the National Labor Rela-

tions Board (the Board). The Board has cross–applied for enforcement of its order. The Board found that Newport News violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), when it discharged and reprimanded employees who had engaged in protected concerted action. Additionally, the Board, pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e), has petitioned for enforcement of its order against Peninsula Shipbuilders' Association (PSA or the Union), and the Union has cross–petitioned to have the order set aside. The Board found that PSA, the employees' bargaining representative, violated § 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), when it failed to represent the non–member South properly, and when it threatened to deny non–union members equal representation with union members in the bargaining unit. We grant enforcement, with a modification, of the Board's order as to PSA, but deny enforcement of the Board's order as to Newport News.

Newport News Shipbuilding and Dry Dock Company is a Virginia corporation engaged in the construction and repair of ocean–going vessels. One of the Company's five major divisional lines is the X–10 Steel and Fabrication Division, which is responsible for cutting and shaping steel into a final product. Within the X–10 Division are the X–12 Shop Fitters Department, which essentially performs a steel carpentry function; the X–13 Shipwrights Department, which provides general maintenance and crane service to other trades; and the X–13 Welding Department. The Company assigns the X–10 employees to either fully exposed areas (platens), partially enclosed areas (sheds), or fully enclosed areas (shops).

When weather conditions prohibit working in the open areas, the affected employees are sent home, or "passed out," pursuant to Article XI of the collective bargaining agreement between the Union and the Company. If the head of the lead trade involved determines that weather conditions preclude working that day, the employees receive a "bad weather pass–out." Employees generally receive about eighteen bad weather pass–outs each year. The Company also at times issues "personal pass–outs" to employees who request them.

There are three significant differences between a personal pass–out and a bad–weather pass–out. First, the personal pass–out, as its name indicates, is granted by management at the request of an individual employee who desires to leave for some reason personal to him, whereas a bad weather pass–out is granted to all affected employees at the sole discretion of management when it believes weather conditions make it too difficult for the employees to work.[1] Second, an employee who receives a personal pass–out is paid for only the time actually worked. With a bad weather pass–out, however, employees frequently receive pay in excess of the actual hours worked.[2] Third, when an employee receives a bad weather pass–out, he is still allowed to work overtime hours during that pay period. An employee receiving a personal pass–out, however, is not permitted to work any overtime hours. Around the time of the incident, employees of the Company had regularly been working overtime on Saturdays. Thus, the employees would have preferred to receive a bad weather pass–out.

On the morning of February 16, 1977, the temperature was below freezing and the wind was blowing. The employees involved worked in the X–12, X–13, and X–18 departments and were assigned to one of the exposed platforms called platen number 9½. The heat source for employees on the 9½ platen was a coal and wood–burning stove (bully) located at the center of the platform. After arriving at work at 7:00 a. m., some of the approximately twenty employ-

---

1. The record indicates that on at least one occasion the Company has issued personal pass–outs to all the employees in a work area.

2. If the employees work less than one hour, they receive pay for two hours of work. If they work more than one hour but less than four, they receive pay for four hours. Employees who receive a bad weather pass–out after working in excess of four hours are paid only for the number of hours actually worked.

ees assigned to the platen began congregating around the bully. At some time before 8:00 a. m., all the employees stood around the bully and discussed the possibility of their being sent home on a pass–out.[3] With Hubert J. South, Jr. as their spokesman, the employees inquired into the feasibility of their being sent home because of the cold weather, either by means of a bad weather pass–out or a personal pass–out.[4] South asked Foreman Minter whether the employees would be sent home, and the latter left to take up the matter with General Foreman Robbins. Several minutes later Robbins and Minter came out to the platform, and Robbins asked the employees whether they planned to work; most indicated that they wanted to go home. South followed Minter back to his office and asked him what was going to be done about sending them home. Minter replied that he did not know. When Robbins returned to the work area a few minutes later, he told the employees that there would be no pass–outs that day, and if they did not return to work, they would be permanently "passed–out" for violating the contract. We emphasize that the employees did not work from the time the entire group congregated around the bully to discuss the possibility of going home until Robbins came out to the platform a second time and ordered them to return to work.

Lewis P. Gray, the Supervisor of Employee Relations, initially planned to fire all the employees who had stopped work. PSA delegate Delmas Linhart met with Gray during the day and worked out a compromise arrangement with the Company. Linhart agreed to the Company's discharge of South as the ringleader. In return, the Company limited the penalty of the other employees to a written warning on their records and docked them for three–tenths of an hour of pay. Linhart interviewed two of the employees involved and then agreed to the discharge of South, a non–member of PSA, based almost solely upon the Company's explanation of the incident and before hearing South's explanation of the affair. Additionally, Linhart failed to request a two–day "cooling–off period" as allowed for in the Union's collective bargaining agreement with the Company. Finally, despite South's request, the Union failed to appeal the grievance South had filed with the Company, and also failed to respond to South when he inquired about the matter.

Following South's discharge and the reprimand of the other employees, PSA sought to solicit union membership among non–union employees. The Administrative Law Judge found that during the efforts to solicit members, agents for PSA allegedly stated to Elmslie Smith that they would "stand up and go to bat" for him if he were a union member; told Charles W. Thompson, Jr. that they could not represent him "as much" as they could a union member; and indicated to Russell Row that South would have received "better representation" had he been in the Union. PSA, as noted above, was the exclusive bargaining representative of the employees involved.

On March 9 and March 17, 1977, Hubert South filed charges with the National Labor Relations Board against Newport News and PSA, alleging violations of § 8(a)(1)

3. The record indicates that the employees first began discussing the possibility of being "passed–out" shortly after arriving at work around 7:00 a. m. Indeed, South discussed such a possibility prior to 7:00, and prior to beginning work he questioned Foreman Minter about their being sent home.

4. There is evidence in the record which could be read as showing that the employees intended to pressure the Company into allowing them to go home. One Russell L. Row, Jr., a member of the X–18 department, testified that the employees decided to stick together on the matter. Row and one Elmslie Smith both testi-

fied that South spoke about sticking together on the matter. Additionally, one Charles W. Green testified that when General Foreman Robbins asked him if he was going to work or if he wanted to go home, he responded that he would do what the group did. Although the Administrative Law Judge mentioned some of this evidence in his decision, neither he nor the Board discussed the effect of this evidence. The manner in which we decide the case makes it unnecessary to determine whether a remand might be proper, for the result would be the same even if the facts were decided more favorably to the Company.

and § 8(b)(1)(A) of the Act respectively. The Board, with one exception worthy of note, adopted the findings of the Administrative Law Judge, and concluded that the Company violated § 8(a)(1) of the Act when it discharged South and reprimanded the other employees. Contrary to the Administrative Law Judge, it found that South and the other employees did in fact engage in a work stoppage on February 16 for a period of about twenty minutes.[5] The Board concluded, however, that the employees' action was for a "purely informational" purpose, and was not an attempt to pressure the Company into sending them home.[6] The Board therefore determined that the work stoppage did not violate the no–strike provisions of the collective bargaining agreement,[7] and thus the Company's discharge of South, as well as the reprimand of the other employees, violated § 8(a)(1) of the Act.

The Board also concluded that the Union violated its duty of fair representation to South, and thus violated § 8(b)(1)(A) of the Act. The Board found that the Union's handling of South's discharge was arbitrary and perfunctory, based primarily on the fact that Linhart, the PSA representative, agreed to South's discharge before hearing South's explanation of the incident and without conducting a thorough investigation of the occurrence.

The Board also found that the statements the Union agents made to non–members constituted threats to deny them equal representation with union members. That, the Board determined, violated § 8(b)(1)(A) of the Act.

The Board ordered Newport News to offer South full and immediate reinstatement to his former position, and, together with the Union, reimburse him for any loss of earnings he may have suffered as a result of the discharge. The Board also ordered the Company to expunge from its records any written warnings given to the other employees who had stopped work. The Board additionally ordered the Company to cease and desist from reprimanding and discharging employees who engage in protected concerted activity. The Board, contrary to the Administrative Law Judge, did allow the Company to dock the pay of the employees for the time they were not working.

The Board held the Union jointly and severally liable with the Company for South's loss of pay. It found that because the Union's failure to represent South properly contributed to his discharge, the Union was therefore responsible for a portion of the pay loss. Finally, the Board ordered the Union to cease and desist from its failure to represent non–members fairly, and from its threats of unequal representation. This appeal followed.

**5.** The Administrative Law Judge concluded that South and the other employees did not engage in a work stoppage and thus ordered the Company to reimburse the workers for the ³/₁₀ of one hour of pay it had deducted from their wages. The Board, however, determined that there was a work stoppage and that the Company could deduct the pay from the wages of the employees who were involved.

**6.** The Board found that the employees, during the work stoppage, were merely waiting for a response from management as to whether they were to be sent home, and this made their action "purely informational."

**7.** Article V of the collective bargaining agreement reads in relevant part:

*Section 5.1. Prohibited Activity.* During the term of this Agreement the grievance procedure and arbitration are the exclusive means of resolving grievances, and the administrative and judicial procedures and remedies are the exclusive means of resolving a dispute of any other kind between the employees (or Association) and the Company. Accordingly, during the term of this Agreement there shall not be, nor shall the Association encourage or sanction, any strike (including sympathy strike), picketing, slowdown or intentional interference with operations nor shall there be any lockout over a labor dispute with the Association.

*Section 5.2. Action in Event of Breach.* (a) Any employee engaging in activity prohibited by Section 5.1 shall be subject to suspension or discharge, at the discretion of the Company, irrespective of the penalty given any other employee for such conduct. If a grievance is filed concerning such suspension or discharge, the only question for the arbitrator shall be "Did the employee engage in activity prohibited by this Article?"

■ We reject the Board's determination that Newport News violated § 8(a)(1) of the Act when it discharged South and reprimanded the other employees. It is a settled rule of law that an employer may discharge employees who breach a no–strike clause or who otherwise violate a collective bargaining agreement. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 246, 82 S.Ct. 1318, 1323, 8 L.Ed.2d 462 (1962); *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953); *NLRB v. Sands Manufacturing Co.*, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939). The theory behind this rule is that a no–strike clause in a collective bargaining agreement "at the very least establishes a rule of conduct or condition of employment the violation of which by employees justifies discipline or discharge." *Atkinson*, 370 U.S. at 246, 82 S.Ct. at 1323.

■ There have been, however, several exceptions created to no–strike provisions of collective bargaining agreements which may preclude an employer from disciplining employees who do in fact strike or engage in a work stoppage. For example, an employer may not discipline employees who engage in a strike to protest unfair labor practices on the part of the employer. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). A strike to protest dangerous working conditions has also been held to be protected activity. *NLRB v. Fruin–Colnon Construction Co.*, 330 F.2d 885 (8th Cir. 1964). See *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). Cf. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154, (1980). Finally, a strike to protest an employer's issuing pay checks not covered by sufficient funds has been considered a protected activity and an employer may not discipline employees who strike for such a reason. *San Juan Lumber Co.*, 154 N.L.R.B. 1153 (1965), enforced on other grounds, 367 F.2d 397 (9th Cir. 1966).

In the case at hand, the Board found that the employees did in fact engage in a work stoppage on the morning of February 16, and this finding is supported by substantial evidence. Thus, it affirmed the Company's action in docking the pay of the employees involved. The pertinent provisions of the collective bargaining agreement prohibit a work stoppage and give the Company the right to discharge an employee for engaging in such conduct.[8] The crucial issue therefore is whether there exists some exception to the no–strike provisions in the collective bargaining agreement which would preclude the Company from disciplining the employees.

The Board based its decision on none of the above–noted exceptions to no–strike provisions.[9] Rather, the Board concluded and now argues on appeal that the action of the employees in stopping work was purely informational and thus did not violate the no–strike provisions of the contract. We are unable to accept that determination.

The Board relied on *Empire Steel Manufacturing Co.*, 234 N.L.R.B. 530 (1978), for the proposition that the employees' action was purely informational and not an attempt to pressure the Company, and was thus protected. In *Empire Steel* a worker had been severely injured on the job. The next morning a representative of the employees met with management to discuss the accident, and following these discussions he called an employee meeting for the last five minutes of the lunch period to inform them about the morning meeting

---

8. 29 U.S.C. § 142(2): "The term 'strike' includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective–bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees." Both the Board and Administrative Law Judge found that the employees engaged in concerted activity when they stopped work. Although the agreement does not contain the words "work stoppage" as such, it does preclude a strike or slowdown of operations, see note 7 supra, and work stoppages are thus encompassed within those terms.

9. Accordingly, we do not consider their possible application. *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

with management and the condition of the injured worker. This employee meeting extended ten minutes past the end of the lunch period, and the employee who had called the meeting was later discharged. The Board held that because terms of a no–strike clause normally envisage conduct intended to bring pressure on an employer to change his ways and because the meeting was purely informational, the no–strike ban did not cover such a meeting and the employer's discharge of the employee was improper. It held that the called meeting was protected activity in its inception and merely ran overtime.

■ We cannot agree that *Empire Steel* supports the Board's decision. The work stoppage in this case did not involve a protected meeting where information regarding a concern of the employees was related to them. Although there is some question as to whether the Board's finding that the employees were not trying to pressure the Company into sending them home is correct, for argument we accept that finding but also note that the only informational aspect of the work stoppage was that the employees were waiting for a response from management as to whether they were going to be sent home. No information was actually disseminated during the time the employees were not working. Nothing in the contract provides that employees can cease work while awaiting a reply to a request to go home.

We emphasize that the employees in this case had no right to stop work, and the board recognized that fact when it upheld the Company's action in docking the employees' pay. Although we recognize the special expertise the Board possesses for interpreting labor contracts, see *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963), the fact remains that the employees took part in an unauthorized work stoppage, and we are unable to accept the Board's finding that the no–strike provisions of the collective bargaining agreement were not thereby violated. That action on the part of the employees permitted the Company to discharge all of them had it so desired.

■ Having determined that the Company could have discharged all the employees, we hold that it was also proper for the Company to discharge South while merely disciplining the other employees. The collective bargaining agreement allows for such action,[10] and the Board found that South was in fact the spokesman for the employees. The Company was entitled to treat South as the leader of the unauthorized work stoppage and therefore discipline him to a greater extent than the other employees. *Poloron Products of Indiana, Inc.*, 177 N.L.R.B. 435, 437 (1969).

■ We note that there is no finding in the record to indicate that the Company acted in concert with the Union when it discharged South and retained the other employees. Although it is arguable that South may not have lost his job had the Union represented him in a more competent fashion, we do not find that to be a basis for requiring the Company to reinstate him, for the record shows that the Company had the right to discharge South, and this is supported by the finding of the Board that there was in fact a work stoppage.

■■ With regard to the Union's representation of South, we hold that there is substantial evidence on the record as a whole to support the Board's finding that the Union violated § 8(b)(1)(A) of the Act by failing to fulfill its duty of fair representation by agreeing to the discharge of South prior to consulting with him and without any substantial investigation of the incident. See *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Thompson v. Brotherhood of Sleeping Car Porters*, 316 F.2d 191, 199 (4th Cir. 1963). Although we find that the Union violated its duty to South, we deny enforcement of the Board's order that the Union reimburse South for any wages he may have lost because of his discharge. Given that the Company had a right to

10. See note 7 supra.

discharge South and thus not be liable for any back pay, we feel it inappropriate to require the Union to bear the responsibility for pay that South had no right to receive and would not have received even had the Union represented him in a more competent fashion. See *Hines*, 424 U.S. at 570–71, 96 S.Ct. at 1059.[11] Thus, although we enforce the Board's order that PSA cease and desist from its failure to represent non–union employees fairly, we deny enforcement of the Board's order so far as it requires the Union to reimburse South for pay to which he was not entitled.

With regard to the Board's finding that the Union made threats of unequal representation to non–members and thus violated § 8(b)(1)(A) of the Act, we hold that there is substantial evidence on the record as a whole to support that finding. Thus, we enforce the Board's order that the Union cease and desist from making such threats.

ENFORCEMENT GRANTED IN PART AS MODIFIED AND DENIED IN PART.

K. K. HALL, Circuit Judge, concurring in part and dissenting in part.

If we were deciding this case in the first instance, I too would find that the work stoppage was unjustified and that the company had the right to discharge South and discipline the others. But our function here is limited. The Board's action is based on a defensible construction of the Act, and its finding that the work stoppage was informational is supported by substantial evidence. Therefore, we should enforce its order. *E. g., NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236–37, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963).

I agree with the majority that the Union violated its duty of fair representation by agreeing so readily to the discharge of South; however, in addition to the grant of injunctive relief I would hold the Union liable, with the company, for South's loss of earnings.

11. "To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrat-

ing breach of duty by the Union." While *Hines* was a suit under § 301 of the LMRA, 29 U.S.C. § 185, the duty of the union involved in that case is similar to the duty involved here.